IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LOIS SHARER and STEVE HUMBER,                     04-CV-1690-BR

          Plaintiffs,                             OPINION AND ORDER

v.

STATE OF OREGON, PETER
OZANNE, and PETER GARTLAN,

          Defendants.

WILLIAM N. LATER
Steenson, Schumann, Tewksbury, Creighton & Rose, P.C.
815 S.W. Second Avenue
Suite 500
Portland, OR  97204
(503) 221-1792

          Attorneys for Plaintiffs

HARDY MYERS
Attorney General
ERIC D. WILSON
Assistant Attorney General
Department of Justice
1162 Court Street N.E.
Salem, OR  97301-4096
(503) 378-6313

          Attorneys for Defendants

1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendants' Motion for Partial Summary Judgment (#35).  On May 26, 2006, the Court heard oral argument on the Motion.  Following additional briefing by the parties, the Court took Defendant's Motion under advisement on June 19, 2006.

For the reasons that follow, the Court **GRANTS** Defendants' Motion.

### FACTUAL BACKGROUND

The following facts are undisputed unless otherwise indicated and, in any event, are stated in the light most favorable to Plaintiffs.

Plaintiffs were hired by the State Public Defender's Office: Steve Humber as an attorney or a computer-network administrator[1] from 1992 to May 2003 and Lois Sharer as an Office Specialist II from September 1999 until July 2002 and then as a legal assistant from July 2002 to May 2003.  In 2001 the State Public Defender's Office became Oregon Public Defense Services (OPDS) under the Oregon Public Defense Services Commission.

In January 2003, OPDS hired Defendant Peter Ozanne as Plaintiffs' supervisor.

---

[1] In ¶ 7 of their Amended Complaint, Plaintiffs refer to Humber as an attorney.  In ¶ 20 of the Amended Complaint, Plaintiffs refer to Humber as a computer-network administrator.

I.    **Facts Related to Plaintiff Sharer**

Sharer suffers from post-traumatic stress disorder, anxiety disorder, depression, and agoraphobia.  Prior to hiring Ozanne as Plaintiffs' supervisor in January 2003, the State Public Defender's Office and OPDS accommodated Sharer's disabilities by allowing her to work a flexible schedule.  After Ozanne became Sharer's supervisor, however, he did not allow her to continue working a flexible schedule.

In February 2003, Sharer left work early to take care of her son.  Ozanne and Defendant Peter Gartlan, also an employee of OPDS,[2] told Sharer that she could not leave early without permission.  Sharer experienced stress from this incident, and shortly thereafter she took time off on the recommendation of her therapist.

On March 17, 2003, Sharer met with Gartlan regarding medical leave.  Sharer provided Gartlan with documentation from her therapist and asked Gartlan to approve the time she took off from work as sick leave.  Gartlan told Sharer that "she was not eligible."  Sharer then informed Gartlan that the office was required to accommodate her disabilities under the Americans with Disabilities Act and that she intended to file a complaint.  Gartlan asked Sharer whether "she intended to sue them and work

---

[2] Plaintiffs do not identify Defendant Gartlan's position with OPDS.

there at the same time, and told her he'd heard enough for one day."  Gartlan also told Sharer that he had reservations about her leave request, and he did not sign it.  On her way out of the meeting with Gartlan, Sharer discovered "defendant had sent an e-mail to all secretarial employees explaining that plaintiff had missed work in order to 'adjust her medications.'"

On March 25, 2003, Sharer made a formal request for accommodation.  At some point, Defendants approved Sharer's request for medical leave.

Sharer returned to work in early April 2003 and discovered other employees were "shunning her because they had read about her medications and disability."  Sharer's counselor recommended several accommodations for Sharer, but Defendants refused to accept the recommendations and requested additional information. On April 10, 2003, Sharer provided the additional information.

On April 14, 2003, Sharer received a written reprimand for failure to provide medical information.  In addition, Defendants moved Sharer's work station away from the common area and placed her on a probationary work plan that required her to keep closer track of her hours.

On April 30, 2003, Defendants held a pre-dismissal meeting with Sharer.  On May 20, 2003, Defendants informed Sharer that her employment was being terminated effective May 27, 2003.

4 - OPINION AND ORDER

## II.  Facts Related to Plaintiff Humber

On March 3, 2003, Gartlan informed Humber of Sharer's accommodation requests and told Humber to tell Sharer to "be reasonable."  Humber suggested Gartlan should "look more closely at the file because there are ADA issues."

On March 19, 2003, Gartlan met with Humber to notify him that his work performance was unacceptable.

On April 7, 2003, Gartlan met with Humber again and raised the issue of Humber keeping a gun in his desk.  Humber removed the gun from his desk.  On the same day, Gartlan relieved Humber of his duties.  On his way out of the meeting with Gartlan, Humber experienced severe chest pain and dizziness.  Humber's doctor recommended he take medical leave until May 1, 2003.  Defendants granted Humber's request for medical leave.

"On or about May 1, 2003, plaintiff Humber's employment was terminated."

## PROCEDURAL BACKGROUND

On November 18, 2004, Plaintiffs filed a Complaint seeking damages and injunctive relief on the grounds that Defendants violated the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112 and 12203; the Rehabilitation Act, 29 U.S.C. § 794; and medical-leave laws when they (1) failed to accommodate Sharer's disabilities, (2) terminated Plaintiffs' employment because of

Sharer's disability, (3) perceived Sharer as being disabled,
(4) terminated Plaintiffs' employment in retaliation for
Plaintiffs' assertions of their rights under the ADA,
(5) terminated Humber's employment because he was associated with
Sharer, and (6) terminated Humber's employment for opposing
Defendants' unlawful employment acts or practices.  In addition,
Plaintiffs alleged Defendants wrongfully discharged Plaintiffs in
retaliation for taking medical leave and for asserting their
rights under medical-leave laws.

On March 9, 2005, Defendants filed a Motion to Dismiss
alleging:  (1) Plaintiffs cannot bring a claim under Title I of
the ADA against the State of Oregon, (2) Plaintiffs can bring
only a claim against the individual Defendants in their official
capacities for prospective injunctive relief under Title I of the
ADA, (3) Plaintiffs cannot bring a claim against Defendants
Ozanne and Gartlan under the Rehabilitation Act, and (4) the
Eleventh Amendment bars Plaintiffs from bringing a claim for
common-law wrongful discharge in this Court.

On April 8, 2005, Plaintiffs filed a Response in which they
conceded they could bring claims under Title I of the ADA only
against Defendants Ozanne and Gartlan in their official
capacities and only for prospective injunctive relief.
Plaintiffs further conceded they could bring claims under the
Rehabilitation Act only against the State of Oregon.  Finally,

Plaintiffs conceded they could not bring their claims for wrongful discharge in this Court.

On June 28, 2005, the Court issued an Opinion and Order granting Defendants' Motion to Dismiss as to (1) Plaintiffs' claims under Title I of the ADA against Ozanne and Gartlan except for Plaintiffs' claim for prospective injunctive relief, (2) Plaintiffs' claims under Title I of the ADA against the State of Oregon, (3) Plaintiffs' claims under the Rehabilitation Act against Ozanne and Gartlan, and (4) Plaintiffs' claims against all Defendants for wrongful discharge.

On September 2, 2005, Plaintiffs filed an Amended Complaint in which they allege Defendants Ozanne and Gartlan violated the ADA and the State violated the Rehabilitation Act when Defendants (1) failed to accommodate Sharer's disability and (2) terminated Plaintiffs' employment.  Plaintiffs also allege Defendants discharged Plaintiffs in retaliation for taking medical leave and for asserting their rights under medical-leave laws in violation of 29 C.F.R. § 825.220.

On March 14, 2006, Defendants filed a motion seeking summary judgment as to Plaintiffs' claims under the Rehabilitation Act on the ground the agency that employed Plaintiffs does not receive federal funds.

## DISCUSSION

Defendants move for summary judgment on Plaintiffs' claims under the Rehabilitation Act on the ground that Plaintiffs have not met their burden to establish a required element of a *prima facie* case of discrimination under the Rehabilitation Act; namely, that Plaintiffs' employer, OPDS, received federal financial assistance. Plaintiffs, however, contend (1) Defendants waived their right to assert Eleventh Amendment immunity and (2) OPDS received federal funding.

**A.    Defendants' Alleged Waiver of Eleventh Amendment Immunity**

Plaintiffs contend Defendants waived their right to assert Eleventh Amendment immunity when they failed to raise the issue of federal funding in earlier motions. Defendants, however, do not allege they are immune under the Eleventh Amendment, but instead they contend Plaintiffs have not established a required element of a *prima facie* case of discrimination under the Rehabilitation Act; namely, that Plaintiffs' employer received federal financial assistance. The Court notes Defendants preserved this defense in their Answer to Plaintiffs' Amended Complaint.

Based on this record, therefore, the Court concludes Defendants did not allege they are immune under the Eleventh Amendment and did not waive their right to raise the lack of federal funding as a defense.

8 - OPINION AND ORDER

**B.    Merits**

The Rehabilitation Act provides in pertinent part:

> No otherwise qualified individual with a
> disability . . . shall, solely by reason of
> her or his disability, be excluded from the
> participation in, be denied the benefits of,
> or be subjected to discrimination under any
> program or activity receiving Federal
> financial assistance.

29 U.S.C. § 794(a).

The Act defines "program or activity" as "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government"  29 U.S.C. § 794(b)(1)(A).

The phrase "program or activity," however, "does not encompass all the activities of the State.  Instead, it only covers all of the activities of the department or the agency receiving federal funds." *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002)(citing *Jim C. v. United States*, 235 F.3d 1079, 1082 (8th Cir. 2000).  "The acceptance of funds by one state agency therefore leaves unaffected both other state agencies and the State as a whole. . . .  The State is accordingly not required to renounce all federal funding to shield chosen state agencies from compliance with Section 504 [of the Rehabilitation Act]" *Jim C.*, 235 F.3d at 1981.

Here it appears Plaintiffs are confused as to the agency under which the State Public Defender's Office operated

9 - OPINION AND ORDER

when Plaintiffs worked there.  The record reflects both the State
Public Defender's Office and OPDS, its successor, were free-
standing state agencies, were separate entities from the Oregon
Judicial Department, were not under the State Court
Administrator's Office, and, in any event, did not receive
federal funds directly.  Plaintiffs correctly assert OPDS merged
on July 1, 2003, with Indigent Defense Services Division (IDSD),
which was at all times a subdivision of the Oregon Judicial
Department under the State Court Administrator's Office and which
received federal funds.  When they merged, IDSD and OPDS became
the Public Defense Services Commission (PDSC) and took over the
public defense contracting functions of the Oregon Judicial
Department in October 2003.  Even if PDSC received federal funds
after the merger in October 2003, which is not at all clear from
this record, Plaintiffs have not shown they were ever employed by
PDSC or any other state agency that received federal funds
directly.  Moreover, the State terminated Humber and Sharer on
May 1, 2003, and May 27, 2003, respectively, and, thus,
Plaintiffs' terminations preceded both the July 1, 2003, merger
of OPDS and IDSD to form PDSC and the October 2003 function
change.  Thus, the discriminatory actions alleged by Plaintiffs
did not occur during the time the entity that had been OPDS may
have received federal funds as part of PDSC.

Nevertheless, Plaintiff contends in her Sur-Response that

the Oregon Judicial Department received federal funds and interacted with OPDS before the merger by "taking its cases and contracting them out and by paying for transcriptions." Plaintiff alleges OPDS, in effect, received federal funds indirectly pursuant to the Rehabilitation Act because OPDS received a benefit from the Oregon Judicial Department.  The Supreme Court, however, has rejected similar arguments.

In *United States Department of Transportation v. Paralyzed Veterans of America*, the Supreme Court addressed the issue whether the Rehabilitation Act applied to companies that did not receive federal funds directly.  477 U.S. 597, 599 (1986), *superseded by statute on other grounds*, Air Carrier Access Act of 1986, Pub. L. No. 99-435, 100 Stat. 1080 (1986). The plaintiff in *Paralyzed Veterans* contended airlines should be subject to the Rehabilitation Act even though they did not receive federal assistance because they were "indirect recipients" of the federal aid provided to airports in the form of improved runways, taxiways, ramps, etc.  *Id*. at 606.  The Court held the airlines were not subject to the Rehabilitation Act and noted even though "federal financial assistance [can] be direct or indirect," the plaintiff was "confus[ing] intended *beneficiaries* with intended *recipients*."  *Id*. at 607 (emphasis in original).  The Court concluded federal assistance did not "follow[] the aid past the recipient to those who merely benefit

11 - OPINION AND ORDER

from the aid." *Id*.

        Similarly, in *National Collegiate Athletic Association v. R.M. Smith*, the Supreme Court considered whether the National Collegiate Athletic Association (NCAA) was subject to Title IX even though it did not receive any direct federal funding because it received dues payments from schools who were the recipients of federal funds.  525 U.S. 459, 464-65 (1999).  The Court found the scope of Title IX and the Rehabilitation Action are "defined in nearly identical terms." *Id*. at 466 n.3.  The Court then reviewed its opinion in *Grove City College v. Bell*, 465 U.S. 555, 563-570 (1984) and noted:

> [W]e held that a college receives federal
> financial assistance when it enrolls students who
> receive federal funds earmarked for educational
> expenses.  Finding "no hint" that Title IX
> distinguishes "between direct institutional
> assistance and aid received by a school through
> its students," we concluded that Title IX
> "encompass[es] all forms of federal aid to
> education, direct or indirect."

*Id*. at 466-67 (internal citations omitted).  The Court also reviewed its opinion in *Paralyzed Veterans*:

> Application of § 504 to all who benefited
> economically from federal assistance, we observed,
> would yield almost "limitless coverage."  We
> concluded that "[t]he statute covers those who
> receive the aid, but does not extend as far as
> those who benefit from it."

*Id*. at 467 (internal citations omitted).  The Court concluded Title IX

        accords with the teaching of *Grove City* and

12 - OPINION AND ORDER

> *Paralyzed Veterans*:  Entities that receive federal
> assistance, whether directly or through an
> intermediary, are recipients within the meaning of
> Title IX; entities that only benefit economically
> from federal assistance are not.

*Id*. at 468.  The Court, therefore, held the NCAA's receipt of
dues "demonstrates that it indirectly benefits from the federal
assistance afforded its members.  This showing, without more, is
insufficient to trigger Title IX coverage."  *Id.*

As noted, Plaintiff does not contend OPDS received
federal funds directly, but only that the Oregon Judicial
Department received federal funds and, in turn, OPDS benefited
from the policies and procedures of the Oregon Judicial
Department.  Here, like the plaintiff in *Paralyzed Veterans,*
Plaintiffs are "confusing intended *beneficiaries* with intended
*recipients*."  The Oregon Judicial Department merely paid state
circuit courts to prepare transcripts of criminal trials for
indigent defendants, which OPDS then used if it represented those
defendants on appeal.  In addition, when OPDS had too many cases,
some of those cases went to contract attorneys hired and paid for
by the Oregon Judicial Department.  These are the kind of
attenuated benefits the Supreme Court found insufficient to
support a finding that an agency received federal funding as
required under the Rehabilitation Act.

Sharer also contends she originally was placed in her
position with the State Public Defender's Office through the

13 - OPINION AND ORDER

Oregon Department of Vocational Rehabilitation (DVR) Hiring
Individuals Ready for Employment (HIRE) System.  Sharer's
placement required a six-month probationary period during which
the DVR paid half of her wages.  Sharer argues this fact is
sufficient to establish the State Public Defender's Office
received federal financial assistance.  The Court disagrees
because these are also the same kind of attenuated benefits that
the Supreme Court found insufficient to establish an employer's
receipt of federal funding in *Smith* and *Paralyzed Veterans*.  In
addition, as noted, even if the tenuous connection between DVR's
partial payment of Sharer's wages during her probationary period
constituted a receipt of federal funding by the State Public
Defender's Office, all of the discriminatory acts alleged by
Plaintiffs occurred years after Sharer's probationary period,
which ended in March 2000.  Plaintiffs have not established even
a tenuous connection between the State Public Defender's Office
or OPDS and the receipt of federal financial assistance during
the period Plaintiffs were employed there.

     Based on this record, the Court concludes Plaintiffs
have not met their burden to establish a required element of a
*prima facie* case of discrimination under the Rehabilitation Act;
namely, that their employer received federal financial
assistance.  Accordingly, the Court grants Defendants' Motion for
Partial Summary Judgment as to Plaintiffs' Rehabilitation Act

14 - OPINION AND ORDER

claims.

**CONCLUSION**

For these reasons, the Court **GRANTS** Defendants' Motion for Partial Summary Judgment (#35).

IT IS SO ORDERED.

DATED this 28th day of June, 2006.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge